**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA   :

 v.         :    **Criminal No. WDQ-13-002**

ANTONIO DAVIS, et al.    :

...oOo...

**GOVERNMENT'S RESPONSE IN OPPOSITION TO THE DEFENDANTS' MOTIONS**
**TO DISMISS FOR LAW ENFORCEMENT MISCONDUCT; SEVERANCE; AND TO**
**SUPPRESS STATEMENTS**

   The United States of America, by and through counsel Rod J. Rosenstein, United States

Attorney for the District of Maryland, and James Wallner, Assistant United States Attorney for said

District, hereby submits this memorandum in opposition to the Defendants's pre-trial motions to

dismiss the Indictment for Government misconduct, to suppress post-arrest statements made by two

of the Defendants and severance.

**PROCEDURAL BACKGROUND**

   On December 20, 2012, five individuals, Antonio Davis (Davis); Rodney Proctor (Proctor);

Christopher Thornton (Thornton); Michael Johnson (Johnson); and Jazman Trusty (Trusty)

(collectively "the defendants") were arrested for their involvement in a Drug Enforcement

Administration (DEA) sting operation involving the robbery of a notional drug dealer.  On December

21, 2012, all five were charged by criminal complaint with conspiracy to violate the Hobbs Act, 18

U.S.C. § 1951, and conspiracy to possess firearms in furtherance of a crime of violence, 18 U.S.C.

§ 924(o).  Each made their initial appearance in United States District Court on December 21, 2012

and were ordered detained until trial.  On January 3, 2013, the same five defendants were indicted

by the United States Grand Jury in the District of Maryland and charged with conspiracy to violate the Hobbs Act, 18 U.S.C. § 1951; conspiracy to distribute and possess with the intent to distribute five kilograms or more of cocaine. 21 U.S.C. § 846; conspiracy to possess firearms in furtherance of a drug trafficking crime and a crime of violence, 18 U.S.C. § 924(o); possession of firearms in furtherance of the same crimes, 18 U.S.C. § 924(c); and being felons in possession of firearms, 18 U.S.C. § 922(g).  Two of the defendants, Johnson and Proctor, have agreed to plead guilty to various counts of the Indictment, but the remaining three defendants have elected to go to trial and have filed various motions in advance of that trial.

## FACTUAL BACKGROUND

In the Fall of 2012, the DEA and Baltimore Police Department (BPD) received information from a reliable confidential source (hereinafter CS-6) that Davis, Proctor, and Thornton were armed drug traffickers and members of the Black Guerilla Family (BGF) gang.  According to CS-6, who is also a member of BGF and knows the three individuals, indicated 1that they earned money by conducting robberies and kidnapings and were active in the Penrose neighborhood of Baltimore City.

On December 12, 2012, at the direction of law enforcement, CS-6 introduced a confidential source working for the DEA (hereinafter CS-8) to Davis, Proctor, Thornton, and Johnson.  During the meeting with the defendants, which lasted approximately eleven minutes, CS-8 explained that he was a drug trafficker and was interested in robbing his source of supply of narcotics, his "coke connect," who would be coming to Baltimore before Christmas.   CS-8 told the defendants that his source would have at least ten kilograms of cocaine when he arrived and offered to split the stolen narcotics with whoever helped commit the robbery.  CS-8 explained that his source typically met his customers inside hotel rooms in Baltimore and suggested that the robbery could occur while CS-8

was meeting the source at the hotel.  CS-8 indicated that he would simply leave the hotel room door open so that the defendants could enter behind him and rob the supplier.

During this same meeting, the defendants expressed interest in committing the robbery, discussed the high cocaine prices in Baltimore, and their intentions to commit the robbery in order to have a "big score" before the holidays.  Thornton, the BGF member who would run the operation, told CS-8 to let him (Thornton) know when the source was coming to Baltimore and his crew, which included the other defendants, would handle the robbery.  Once CS-8 left, CS-6 heard Thornton tell the group that they (the defendants) would have to kill CS-8 after the job was finished to eliminate any trail leading back to the defendants.

One week later, on December 17, 2012, Johnson called CS-8 to coordinate the plans for the robbery.  CS-8 told Johnson that the source would be coming into Baltimore "heavy," meaning he would have a large quantity of cocaine when he arrived.  Johnson asked CS-8 if he had any other sources of supply because he had been looking for a cocaine supplier.  He also asked CS-8 to find a car to help them commit the robbery.  CS-8 explained to Johnson that the cocaine supplier had recently cheated him during a drug transaction saying, it was "supposed to be a key [kilogram] and the shit was like a 7 and a half [750 grams]."  CS-8 then asked Johnson "if everyone was on point [ready, willing, and able to commit the robbery]," because sometimes "people say they want it, but they really don't want it."  Johnson assured CS-8 that he personally wanted to commit this robbery, responding "this shit right here make my day . . . this my line of work."  Though he (Johnson) could not speak for the others, Johnson indicated he was "100 [%] committed."  The conversation ended with CS-8 telling Johnson to talk to the other defendants and make sure they were ready to commit the robbery.  CS-8 also told Johnson that he (CS-8) would provide a car, and all the defendants

needed for the robbery was "a couple of jaunts [guns]."

On December 19, 2012, CS-8 again met with Davis, Proctor, and Thornton and told the group that the source would arrive in Baltimore the following day and that the planned robbery could proceed. The group discussed their plans to sell the stolen narcotics, with Thornton saying, "yeah, take that shit straight to the block [sell it on the streets]." When CS-8 asked if everyone was "ready to dance [ready to commit the robbery]," Thornton replied, "[e]verybody down [ready to commit the robbery]." Later in the conversation, CS-8 again asked the group if anyone had any hesitation in committing the robbery, and Proctor answered "my family has to eat." While covering the logistics of the robbery, Davis asked CS-8 "[Does] he [the intended robbery victim] got a lot of people down here?" to which CS-8 responded, "it ain't like you gonna bump into him."

On the day of the planned robbery, December 20, 2012, CS-6 was provided a car, which had previously been wired for audio/video recording. CS-6 then drove to meet Johnson and the two traveled together and met Davis, Proctor and Thornton in West Baltimore. While allegedly waiting for CS-8 to arrive, CS-6 was arrested under the guise of an open warrant. CS-6 then left the keys to the vehicle with Davis. After CS-6's fictitious arrest, Davis, the driver, Proctor, the front passenger, Thornton and Johnson drove and picked up Trusty. The recording equipment in the vehicle showed all five individuals and managed to intercept some of their conversations. According to Trusty, who gave a statement after his arrest (see *supra*), Thornton advised him that they (the defendants) were going to rob someone. After entering the vehicle, the defendants, including Trusty, engaged in various conversations, indicating their knowledge of the up-coming robbery.

Eventually, the defendants met CS-8, and advised him (CS-8) that CS-6 had been arrested. During this meeting, CS-8 again explained that the source would take him (CS-8) to the hotel room

4

where the cocaine was being stored and CS-8 would send a text message to the defendants identifying the hotel room number. CS-8 then inquired if they (the defendants) were still willing to commit the robbery and if they (the defendants) were satisfied with the split of the approximately 10 kilograms of cocaine. During this encounter the surveillance equipment in the vehicle captured all of the defendants listening to CS-8. None of the defendants appeared surprised or concerned by the conversation and at no time did any of the defendants attempt to leave the vehicle or voice an objection to CS-8's plan. Once CS-8 left, the defendants discussed how "greedy" CS-8 was for wanting to keep half of the stolen narcotics and expecting the defendants to split the rest. The defendants then discussed their plans to rob CS-8 and steal his (CS-8's) portion of the drugs and his money. Proctor stated, "Gonna have to sit on the fat boy [CS-8]." Thornton said, "We gonna take that money. Know what I'm saying," referring to the money CS-8 would have on him to make the drug purchase.

As the defendants followed CS-8 to commit the robbery, the BPD Tactical Team stopped and arrested Davis, Proctor, Johnson, Thornton, and Trusty. During searches of their persons conducted incident to their arrests, the police recovered, among other things, a latex glove, two black gloves, and a black mask from Davis, a black stocking cap, a loaded .22 caliber pistol, and eight miniature pink plastic bags containing plant material from Proctor, a pair of latex gloves, a ski mask, and a black hat from Johnson, and a black stocking cap and a black hat from Trusty.

## ARGUMENT

## I.    THERE IS NO GOVERNMENTAL MISCONDUCT REQUIRING DISMISSAL OF THE OF THE INDICTMENT

### A.    DEFENDANTS' ARGUMENTS

The defendants now seek dismissal of the Indictment for "law enforcement misconduct and overreach." The defendants seem to combine several theories for dismissal, including factual and legal impossibility, as well as entrapment, all while feigning outrage over the Governments' conduct for an operation that they note is a common ["quotidian"] law enforcement operation. The defendants seem to argue that despite the nearly universal acceptance of these types of operations in several circuits, the totality of the circumstances in cases conceived in the mind of law enforcement are outrageous, entitling them to heretofore unprecedented relief.

## B.    IMPOSSIBILITY

Because of the "quotidian" use of these types of operations, they have been scrutinized by various appellate courts. In fact, on the same day these defendants were indicted, January 3, 2013, the Fourth Circuit addressed a nearly identical set of facts in *United States v. Min*, 704 F.3d 314 (4th Cir. 2013) *cert denied* 133 S.Ct. 2752 (2013), a "stash house case." In *Min,* the Fourth Circuit held, "[b]ecause 'special conspiracy-related dangers remain' apart from the danger of attaining the particular objective, impossibility does not terminate conspiracy." *Min,* 704 F.3d at 322, *quoting United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003). The Fourth Circuit continued that the Supreme Court has held, "that the charge of conspiracy was not defeated where police actions frustrated the conspiracy's specific objective before its completion without the conspirators' knowledge." *Id.* The holding in *Jimenez Recio*, according to the Fourth Circuit, "extend[ed] naturally to the present case, where the police [] defeated the criminal objective from the beginning, by inventing it." *Cf. United States v. Belardo–Quinones*, 71 F.3d 941, 944 (1st Cir.1995) ('There is no basis for making a distinction between those who start a conspiracy that is impossible from the beginning and one who joins a conspiracy that has become impossible due to intervening events

unknown to the conspirators.').""

Additionally, the Fourth Circuit found that every other circuit that had faced similar "stash house stings," where law enforcement had fabricated the existence of drugs, concluded that factual impossibility was not a defense to the inchoate offense of conspiracy. *See, e.g., United States v. Corson*, 579 F.3d 804, 810 (7th Cir.2009) ("Though it might seem odd, the fact that the stash house, the drugs—indeed the whole plot—was fake is irrelevant. That the crime agreed upon was in fact impossible to commit is no defense to the crime of conspiracy. The crime of conspiracy is the agreement itself.') (internal citations omitted); *United States v. Orisnord*, 483 F.3d 1169, 1177 (11th Cir.2007); *United States v. Rodriguez*, 360 F.3d 949, 957 (9th Cir.2004); *see also United States v. Giry*, 818 F.2d 120, 126 (1st Cir.1987) (finding factual impossibility irrelevant to crime of conspiracy to import cocaine orchestrated by DEA agents)." *See Min*, 714 F.3d at 321-22; *see also United States v. Spentz,* 653 F.3d 815 (9th Cir.2011).

## C.   ENTRAPMENT

Along with impossibility, the defendants claim that the activities of the Government agents constituted "entrapment," but the affirmative defense of entrapment can only prevail if two elements are present: "government inducement of the crime and lack of predisposition on the part of the defendant to engage in criminal conduct." *Mathews v. United States*, 485 U.S. 58, 63 (1988). The defendant has the initial burden to provide evidence of the first element, government inducement, before the burden shifts to the government to prove the second element, that the defendant was predisposed to commit the crime. *Jacobson v. United States*, 503 U.S. 540, 549 (1992). It is well established that the "principal element in the defense of entrapment [is] the defendant's predisposition to commit the crime." *United States v. Russell*, 411 U.S. 423, 433 (1973).

7

Consequently, even if a defendant successfully demonstrates that the government induced him to commit a crime, "an entrapment defense fails if the defendant was predisposed to commit the crime." *Jacobson*, 503 U.S. at 548-49; *United States v. Osborne*, 935 F.2d 32, 37 (4th Cir. 1991).

Here, the Government did not induce the defendants to commit the robbery, but simply offered them an opportunity to commit a crime that they willingly accepted. Second, even assuming *arguendo* that the Government's actions constituted inducement, the defendants were predisposed to commit the robbery.

1. **The Government did not induce the defendants to commit the robbery.**

To prevail on an entrapment defense, the defendants must produce "more than a scintilla of evidence" that the Government induced them to commit the crime. *Jacobson*, 503 U.S. at 549; *Unites States v. Singh*, 54 F.3d 1182, 1189 (4th Cir. 1995). Inducement requires more than mere solicitation by the government. *United States v. Daniel*, 3 F.3d 775, 778 (4th Cir. 1993). "Inducement is a term of art: it involves elements of governmental overreaching and conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party." *Id*. It is insufficient to show that the government merely provided the defendants with an opportunity to commit a crime because "solicitation by itself is not the kind of conduct that would persuade an otherwise innocent person to commit a crime." *United States v. Osborne*, 935 F.2d 32, 36 (4th Cir. 1991); *See also Mathew*s 485 U.S. at 66 (holding evidence that the government provided only the *opportunity* to commit the crime and that the defendant availed himself of that opportunity does *not* demonstrate inducement). Inducement requires more than a showing of solicitation plus initial "unreadiness" to commit the crime. *United States v. Hsu*, 364 F.3d 192, 200 (4th Cir. 2004), rather, "the defendant[s] must produce 'more than a scintilla' of evidence of 'inducement,' defined as

8

solicitation *plus* some overreaching or improper conduct on the part of the government." *Id.*

Courts are loathe to find inducement absent some unique or compelling circumstance far more extreme than anything found in this case;  for example, using physical threats, *United States v. Becerra,* 992  F.2d 960, 963 (9th Cir. 1993); constant calls and belligerent threats, *United States v. Groll,* 992 F.2d 755, 759 (7th Cir. 1993); forceful solicitation and dogged insistence until the defendant capitulates, *United States v. Rodriguez*, 858 F.2d 809, 815 (1st Cir. 1988); knowingly preying on a recovering addict's sympathies to obtain drugs, *Sherman v. United States*, 356 U.S. 369, 373 (1958); repeatedly suggesting the activity which succeeds only after the defendant has lost his job, *United States v. Kessee*, 992 F.2d 1001, 1003 (9th Cir. 1993); telling the defendant that the agent is suicidal and in desperate need, *United States v. Sullivan,* 919 F.2d 1403, 1419 & n. 21 (10th Cir. 1990); persisting in the suggestion of wrongdoing even after the suggestions were ignored, *United States v. Sligh*, 142 F.3d 761, 763 (4th Cir. 1998); or pleas by the undercover agent claiming terminal cancer and the need to support his new wife, with the knowledge that the defendant's sister recently died from cancer, *United States v. Nations*, 764 F.2d 1073, 1080 (5th Cir. 1985).

The defendants in this case were not induced to commit a crime, they were merely offered an opportunity to commit the robbery and eagerly accepted.  When the government does not need to "plead, argue, or coerce a reluctant defendant" or resort to any extreme methods of persuasion to convince the defendants to commit a crime, the defendant's decision to commit the crime is not induced.  *See United States v. Daniel*, 3 F.3d 775, 779 (4th Cir. 1993) .  In *Daniel*, DEA agents were alerted that Daniel was illegally providing an informant with prescriptions to feed his drug abuse. *Id*. at 776.  At the direction of law enforcement, the informant introduced Daniel to an undercover agent to whom Daniel proceeded to illegally provide prescriptions. *Id.* at 776-77.  The Fourth Circuit

rejected Daniel's defense of entrapment concluding Daniel did not meet his burden of proving he was induced by the government. *Id.* at 778. Daniel accepted an opportunity to commit a crime and the undercover agents who purchased the prescriptions from Daniel "didn't have to plead, argue, or coerce a reluctant defendant into unlawfully selling a prescription." *Id.* at 779. The "mild forms of persuasion" utilized by the government, consisting of the undercover agents reminder that there was money to be made and promise not to alert authorities, did not constitute inducement. *Id.*

In the present case, neither CS-6 nor CS-8 had to plead, argue, or coerce the defendants to agree to the robbery. Within an eleven minute conversation, CS-6 introduced CS-8 to the defendant, CS-8 proposed the robbery, and the defendants agreed to CS-8's proposal without any hesitancy or reluctance. Instead, the defendants expressed a willingness to commit the crime in the hopes of a "big score" before Christmas, and asked CS-8 to contact them with more information. Their full throated acceptance of the opportunity defeats any argument of inducement.

Additionally, when a defendant rejects multiple opportunities to withdraw from committing a crime proposed by an undercover operative, the defendant's decision to commit the crime is not induced. *Osborne*, 935 F.2d at 38 (finding no inducement where the defendant needed to submit several forms at different points in time and each successive transaction with the government required an affirmative decision on the defendant's part to continue). In the present case, at each stage of the operation the government gave the defendants an opportunity to withdraw from the plot. When CS-8 and the defendants first met, the defendants expressed their interest in committing the robbery. One week later, when Johnson contacted CS-8 to cover logistics CS-8 asked if everyone was still on board, thus providing an opportunity for at least Johnson to withdraw. Johnson, nevertheless affirmed his commitment, saying he was "100 [%] committed" and that he would check

with the other defendants.  Johnson also indicated to CS-8 that the robbery was going to help

everyone and he appreciated CS-8 bringing it to them.  Two days later, at the next meeting to review

the plan, CS-8 again provided an opportunity for the defendants to withdraw and asked them to

confirm that they were still interested in committing the robbery.  Once again the defendants chose

to continue with Proctor commenting, "my family has to eat."  Finally, on the day of the planned

robbery after CS-6 had been arrested, CS-8 checked with the defendants one last time to make sure

they wanted to commit the robbery.  Although this was the first time Trusty had met CS-8, the video

surveillance showed Trusty listening attentively; not objecting to the plan; and not expressing a

desire to leave.  Further, Trusty had no prior contact with any government source.  His limited

contact removes any opportunity for the government to "induce" Trusty to commit the crime.[1]

Therefore, the defendants had multiple opportunities to withdraw from the robbery and chose to

continue at each stage.  Additionally, they continued with the plan, even after the fictitious arrest of

CS-6, and drove themselves to the robbery.  Consequently, Governmental actions did not induce the

defendants to commit the crime.

> **2.     Even if there had been inducement, which there was not, the defendants
> were predisposed to commit the robbery**

"The principal element in the defense of entrapment [is] the defendant's predisposition to

commit the crime." *Russell*, 411 U.S. at 433.  If showing government inducement were sufficient

to secure the entrapment defense, "it would be impossible ever to secure convictions of any offences

which consist of transactions that are carried on in secret." *Sherman v. United States*, 356 U.S. 369,

377 n. 7 (1958).  In order to establish predisposition, the government need not show that the

---

[1]     Trusty discussed his introduction to the planned robbery in his statement, which is
the subject of a motion to dismiss and is addressed *infra*.

defendant had specifically contemplated committing the charged crime, or that he had previously committed any crime. *Osborne*, 935 F.2d at 37-38; *United States v. Akinseye*, 802 F.2d 740, 743 (4th Cir. 1986). "It is sufficient if the defendant is of a frame of mind such that, once his attention is called to the criminal opportunity, his decision to commit the crime is the product of his own preference and not the product of government persuasion." *Osborne*, 935 F.2d at 38.

"Predisposition may be found from a defendant's ready response to the inducement offered." *United States v. Hunt*, 749 F.2d 1078, 1085 (4th Cir. 1984); *Unites States v. Jones*, 976 F.2d 176, 179 (4th Cir. 1992) ("The government may meet its burden [of proving predisposition] by demonstrating the defendant's ready response to the inducement offered.").

In the present case, the defendants were predisposed to commit the robbery. The defendants were active members of the BGF and readily agreed to commit a robbery with a purported drug dealer within eleven minutes of meeting him. Under *Hunt*, their "ready response" was sufficient to show predisposition.

Several additional factors support the government's contention that the defendants were predisposed to commit the robbery. First, the defendants were conversant in the language of drug distribution as evidenced by their discussion of high cocaine prices in Baltimore, use of slang, and desire to commit the robbery before Christmas for a "big score." Additionally, Johnson told CS-8 that he was looking for a cocaine supplier and that "this shit right here make my day . . . this my line of work." The defendants also discussed their plans to sell the stolen cocaine as one defendant enthusiastically indicated they should "take that shit straight to the block [sell it on the streets]". Second, the defendants conspired to rob and later kill CS-8, once they completed the fictional robbery. They discussed these plans after initially meeting CS-8, and again in the vehicle on the day

of the planned robbery, with Proctor saying, "Gonna have to sit on the fat boy [CS-8]," and Thornton responding, "We gonna take that money.  Know what I'm saying."  Third, the questions asked by the defendants during the meetings with CS-8 and the items seized from the defendants demonstrated that the defendants were familiar with committing this type of crime.  The defendants asked relevant questions pertaining to whether the source would be armed and have multiple rooms, whether others would be on scene, and where the source tended to do his transactions.  Additionally, upon their arrest, the defendants were found possessing articles for the planned robbery, including ski masks, gloves, and a gun.

From the reasons above, it is abundantly clear that the Defendants were predisposed to commit the planned robbery.

### D.    GOVERNMENTAL MISCONDUCT

While the defendants mention all of the "defenses" discussed *infra,* they do not argue that the Indictment should be dismissed for factual impossibility nor do they argue that they were induced to commit the crime.  Rather the defendants seek, in conjunction with these defenses, dismissal because the "provision by law enforcement of a complete, but impossible, crime constituted an unreasonable inducement...absent any predisposition to commit such a crime."  *See* Def Motion at 5.  While the defendants concede that "the law permits the police to provide an opportunity to commit a crime for the otherwise criminally-inclined...it does not permit [law enforcement] to create one out of whole cloth."  *Id*.  The defendants continue that these sting operations are a "gross abuse of authority" because they "diverge[] [from] the enforcement of the law [to] the creation of crime."  *Id*. at 6.  In short, the defendants seek dismissal on public policy grounds arguing that law enforcement should no longer be permitted to utilize "stash house cases" because these operations

13

are "so outrageous as to shock the conscience" and presumably, although not mentioned in their motion, violate their clients' Due Process rights. *See Daniel*, 3 F.3d at 779.

In order to constitute a due process violation, however, the "Government's conduct must be so outrageous as to shock the conscience of the court." *United States v. Jacobson*, 916 F.2d 467 (8th Cir.1990)(citing *Rochin v. California*, 342 U.S. 165, 172 (1952)). But "Government conduct is not outrageous simply because it may be somewhat offensive." *United States v. Goodwin*, 854 F.2d 33, 37 (4th Cir.1988). According to the Fourth Circuit, appellate courts have over time continued to demonstrate a high shock threshold in the presence of extremely unsavory Government conduct. *Osborne,* 935 F.2d at 36, and the Ninth Circuit, albeit in unreported cases, has addressed due process claims as it relates to stash house cases. *See United States v. Velasquez-Lopez*, 510 Fed.Appx. 559 (9th Cir. 2013)(Government's conduct was not outrageous, as would warrant dismissal of indictment, in arranging sting operation intended to catch criminals involved in home invasion robberies in which defendant and others were recruited to steal large quantities of cocaine from fictional stash house, where government knew that there was epidemic of violent home invasions in the area); *United States v. Lopez-Mejia*, 510 Fed.Appx. 561 (9th Cir. 2013)(Government's conduct in setting up of sting operation intended to catch criminals involved in home invasion robberies in which defendant and others were recruited to steal large quantities of cocaine from fictional stash house was not so outrageous as to warrant dismissal of charges for conspiracy to possess with intent to distribute cocaine and possession of firearm).

According to the Supreme Court, the defense of outrageous government conduct is limited to extreme cases in which the government's conduct violates fundamental fairness and is "shocking to the universal sense of justice mandated by the Due Process Clause of the Fifth Amendment."

*United States v. Russell*, 411 U.S. 423, 431-32 (1973).  Nothing about the operation in this case is different from the cases addressed by the Ninth Circuit, which are designed to address the prevalence of largely unreported home invasion robberies of drug dealers.  In fact, the script utilized by law enforcement in this case, and perfected over time, is nearly identical to the scripts used in dozens of other similar cases throughout the country.  Without operations like this one, law enforcement could not prosecute the individuals who commit these crimes because they are rarely reported and the victims are unwilling to cooperate with law enforcement.  Generally, the only way law enforcement even becomes aware of these types of home invasions is if a shooting or homicide occurs during the commission of the robbery or when the victim violently retaliates against the suspected robbers.  Given the prevalence of these crimes and the universally accepted strategy used throughout the country to arrest those who commit them, this Court should refrain from exercising its discretion and dismissing the Indictment.

### E.      REQUESTED RELIEF

Finally, the defendants seek dismissal of the Indictment and presumably desire this motion to be decided pre-trial.  Again, without support, the defendants want the Government to present the entire prosecution during pre-trial motions, so the Court can rule on the Government's conduct.

In the interest of judicial economy, the Government seeks to have the ruling on this motion in conjunction with the trial, and prior to close of the Government's case.  Should additional evidence be necessary, this evidence can be taken outside the presence of the jury before the conclusion of the Government's case.  The alternative would require the Government to call practically every witness including each cooperating witness and most law enforcement officers to illicit the same testimony that the jury will hear.

## II.     THE DEFENDANTS' POST ARREST STATEMENTS WERE KNOWINGLY AND VOLUNTARILY MADE

After their arrest, the defendants were transported to the Baltimore District office (BDO) of the DEA.  Each defendant was individually advised of his constitutional rights.  Trusty, Davis and Johnson then provided statements to the DEA, while Proctor and Thornton did not.  Trusty and Davis now move to suppress their statements.

Statements made to law enforcement must comply with the requirements of *Miranda* and the Due Process clause of the Fifth Amendment Statements.  *Colorada v. Connelly*, 479 U.S. 157 (1986)*; Miranda,* 384 U.S. 436 (1966).  Where *Miranda* rights have been waived, the analysis of the voluntariness of the *Miranda* waiver and the voluntariness of the statements under the Due Process Clause is the same.  *United States v. Christobal*, 293 F.3d 134 (4th Cir. 2002).

As the Supreme Court held in *Moran v. Burbine,* a defendant may waive his *Miranda* rights "provided the waiver is made voluntarily, knowingly and intelligently."  *Burbine,* 475 U.S. 412, 421 (1986). In order to be knowing and intelligent, the waiver must have been made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  *Christobal ,*293 F.3d at 139-140.  The test for determining whether a statement is voluntary under *Miranda*, "is whether the defendant's will has been overborne or his capacity for self-determination critically impaired."  *Id* at 140, *quoting United States v. Pelton,* 835 F.2d 1067, 1071 (4th Cir. 1987).  To make this determination, courts must consider the "totality of the circumstances," including the characteristics of the defendant, the setting of the interview, and the details of the interrogation.  *Pelton*, 835 F.2d at 1071.

Coercive police activity is a necessary predicate to a finding that a *Miranda* waiver was

involuntary. *Connelly*, 479 U.S. at 167. Such coercion has been found where the suspect was subjected to severe physical abuse, *see Brown v. Mississippi*, 297 U.S. 278 (1936), held incommunicado and questioned for over 36 hours without sleep or rest, *see Ashcraft v. Tennessee*, 322 U.S. 143 (1944), given "truth serums," *see Townsend v. Sain*, 372 U.S. 293 (1963), or threatened with a loaded gun while wounded, *see Beecher v. Alabama*, 389 U.S. 35 (1967). A deficient mental condition (whether the result of a pre-existing mental illness or, for example, pain killing narcotics administered after emergency treatment) is not, without more, enough to render a waiver involuntary. *Christobal,* 293 F.3d at 141 (waiver given after the suspect had been shot multiple times, undergone emergency surgery and given pain killers and narcotics found to be voluntary). "While mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." *Connelly*, 479 U.S. at 165.

In this case, two defendants, Trusty and Davis, made statements to law enforcement. Both Davis and Trusty were interviewed at the BDO. Prior to Davis's interview commencing, a Special Agent (SA) with the DEA, Bernard Malone, advised Davis of his rights, which was witnessed by Task Force Officer (TFO) Craig Jester. Davis acknowledged that he understood his rights and executed a DEA "Advice of Rights" form. During the interview, which began at approximately 4:00 p.m. and latest approximately and hour, Davis denied the use of any drugs or alcohol in the preceding 24 hours and indicated that he did not take any medication or had any medical problems that would impair his ability to understand the circumstances of his arrest or statement. Davis then gave a detailed statement concerning the plans for the robbery, and his and his co-conspirators' involvement with the conspiracy.

Similarly, SA Malone and TFO Jester interviewed Trusty.  During Trusty's interview, which began approximately 6:00 p.m., and lasted approximately one hour and fifteen minutes, Trusty acknowledged his rights, but refused to sign the DEA "Advice of Rights" form.  Nevertheless, Trusty stated that he had not used any drugs or alcohol in the preceding 24 hours and had no other medical conditions or problems.  During Trusty's interview, Trusty acknowledged being picked up by Thornton and three other individuals, whom he did not know, at approximately 1:00 p.m.  Trusty then explained that he entered the vehicle and at some point prior to meeting with CS-8, Thornton explained to him (Trusty) that they (the defendants) were going to " rob a dude."  Trusty then explained that he traveled with the group  and met "a Fat Guy" (CS-8), who explained to them that the "split" for the robbery would be "5 and 5."  Trusty then explained that he understood that to mean that the "fat guy" would get five kilogram and five kilograms of coke would be "for us."  Trusty further explained that he did not know how the group was going to divide the coke, and that although he did not have one, he assumed that the other defendants had guns.

Here, each defendant was advised of their rights, indicated that they had no medical conditions and were not under the influence of any substances.  The defendants then each gave a concise statement concerning their involvement in the operation within a reasonable amount of time after their arrest, and during a relatively short interview.  At no time were any threats, coercion or promises made to either defendant in an effort to illicit the statements.  Further, while three individuals made statements to law enforcement, two other did not, indicating a lack of intent on the part of the interviewing agents to overcome the will of any particular individual.  Clearly, the defendants' statements were knowingly and voluntarily made.

## III.   SEVERANCE

Originally, the three remaining defendants moved for severance, but now only Trusty seeks to be severed from Davis and Thornton.

Generally, defendants may, and indeed should, be indicted and charged together if they are alleged to have participated in the same act or transaction. *See* Fed.R.Crim.P. 8(b); *Zafiro v. United States*, 506 U.S. 534, 537 (1993).  When such defendants have been joined properly under Rule 8(b), a district court should grant severance under Rule 14 "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.  Although limiting instructions often will suffice to cure any risk of prejudice as a result of the joint trial, in some situations the risk of prejudice is so high as to require a separate trial. *United States v. Hayden*, 85 F.3d 153, 160 (4th Cir.1996).

Situations, like the one in this case, arise where the out-of-court confession of a non-testifying codefendant (Trusty and Davis), are admissible against that defendant, but otherwise inadmissible hearsay against anyone else, and inculpates one or more of the other defendants.  In *Bruton v. United States*, the Supreme Court acknowledged that the prejudice resulting from the introduction of a non-testifying codefendant's confession that directly implicates the defendant is so severe that even when the jury is instructed to consider the confession only against the codefendant, the other defendant's Sixth Amendment right to confrontation is necessarily violated. *Bruton v. United States*, 391 U.S. 123 (1968) ("[W]here the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial ... we cannot accept limiting instructions as an adequate substitute for [the defendant's] constitutional right of cross-examination.").

Subsequent decisions have refined *Bruton*'s holding significantly. First, in *Richardson v. Marsh*, the Supreme Court held that the Confrontation Clause is not implicated so long as the codefendant's confession, accompanied by a limiting instruction, "is redacted to eliminate not only the *defendant's* name, but any reference to his or her existence." *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). This is true even when the confession "inferentially incriminates" the defendant because other evidence admitted subsequently at trial clearly links the defendant to the statement in an inculpatory manner. *Id.* In *Richardson*, the codefendant's statement recounted his conversation with another person during the car ride on the way to the scene of the crime, in which they planned the details of the crime. *Richardson*, 481 U.S. at 208–11. When a third person and the confessing codefendant were tried jointly, the statement was redacted to eliminate all mention of the fact that the defendant had been in the back seat of the car at the time. Later, the defendant herself testified that she was in the car, which implied she had heard the conversation described in the confession, and knew of the plan to commit the crime. The Supreme Court deemed the confession admissible (with a limiting instruction), reasoning that where "such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence. Specific testimony that 'the defendant helped me commit the crime' is more vivid than inferential incrimination, and hence more difficult to thrust out of mind." *Id*. at 208.

The Supreme Court later clarified that a codefendant's confession is facially, not inferentially, incriminatory if it "replace[s] a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notif[ies] the jury that a name has been deleted." *Gray v. Maryland*, 523 U.S. 185, 195 (1998). The Court reasoned that redaction which directly reveals the existence of the non-confessing defendant prejudices him in much the same way as the direct accusation in *Bruton*. Under *Gray*, a

confession is "facially incriminatory," and thus inadmissible even with a limiting instruction, where the inferences required to link the statement to the defendant are of the type "that a jury ordinarily could make immediately, even where the confession was the very first item introduced at trial." *Id*. at 196. The non-testifying codefendant in Gray "responded to the question 'Who was in the group that beat Stacey,' with the phrase, 'Me, [space], and a few other guys.' " *Gray*, 523 U.S. at 192.

The Supreme Court has yet to face a situation in which a confession's reference to other defendants is less obvious than a blank space, such as where defendants' names are replaced with generic pronouns. However, taking their cues from *Gray*, the Fourth Circuit has held admissible a codefendant's redacted statement that referred to the existence of another person through neutral phrases. *United States v. Akinkoye*, 185 F.3d 192, 198 (4th Cir.1999). In that case, each of two codefendants made an out-of-court statement implicating the other. The statements were altered by replacing the defendants' respective names with the phrases "another person" or "another individual." *Id.*

In *Min,* the Fourth Circuit addressed the redacted statements of a non-testifying codefendant in the same factual scenario before the Court, "a stash house case." According to the Court, with the statement written in the third person and in grammatically correct phrases, the redacted confession referred generally and without facial incrimination to some number of individuals who could, or could not, be the other defendants. The statement did not implicate any one defendant in particular, nor did it leave the jury to fill in any obvious blanks, and the Court concluded that the district court did not abuse its discretion by denying defendants' motions to sever, and that Min's redacted confession was properly admitted against him with a limiting instruction. Further, the Court held that the confession was admissible without severance of the other defendants even though the

21

confession was strongly corroborated by other inculpatory evidence presented at trial.  According to the Fourth Circuit, "a confessions does not become facially incriminatory when the government introduces evidence at trial that links the confession to other defendants."  *See Min,* 704 F.3d at 321.

Here, two defendants gave detailed statements admitting to their involvement with other members of the conspiracy.  Each of their statements does, in some manner, implicate the other defendants.  While Davis and Thornton no longer seek severance from each other, they do wish to be severed from Trusty, and Trusty also has moved for his severance from the other two.  Aside from potential inculpatory information being inferred by the jury from a non-testifying co-conspirators statements. Trusty is in a far different position than the other two defendants.  Because Trusty was not involved in the planning meetings, his defense may be vastly different than the approach of either Davis and Thornton, who actively participated in planning the robbery.  Yet, despite these potential conflicting defenses, a district court does not abuse its discretion in denying a motion for severance unless the conflicting defenses are "so prejudicial that the differences are irreconcilable, and that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty."  *United States v. Spitler*, 800 F.2d 1267, 1272 (4th Cir.1986).

Finally, the Government believes that the two statements can be sanitized to avoid the need for severance.  First, Trusty's statement implicates only Thornton because he is the only person that Trusty knew.  In fact, he indicated in his statement that when he entered the car he (Trusty) did not know the other individuals.  Trusty merely stated that he was called by Thornton and told to come outside.  Once outside, Trusty stated that he got into a grey truck with Thornton and three other people that he did not know.  While riding in the truck the front seat passenger (Proctor) received a telephone call, and following the call the driver (Davis) stated that they had to meet a guy down

by the stadium.  Finally, Trusty stated that while driving to the stadium Thornton told him that they were going to "rob a dude."  If this statement was "sanitized" to state that Trusty received a phone call and was told to come outside and then entered a grey truck, which was occupied by four individuals; that once inside the vehicle, someone received a call and Trusty was advised that they were going to meet an individual at the stadium; and that there was going to be a robbery, the statement would be a generalized with generic pronouns that would prevent the jury from drawing any conclusions regarding the identity of the individual who called Trusty and/or the identity of the individual who informed him of their plan to commit the robbery.

Additionally, Trusty also stated that once he met the "fat dude (CS-8)" he knew that the robbery was going to be for ten kilograms of cocaine; that he did not know how the cocaine would be divided among the conspirator, and that while he did not have a gun he expected other conspirators were armed.  Again this statement does not inferentially incriminate any particular individual in the vehicle and does not indicate who, if anyone, was armed or involved in the crime, but merely illustrates Trusty's knowledge of the existence of the conspiracy among a group of otherwise unidentified individuals.

Davis's statement, on the other hand,  is inculpatory of Thornton, but is largely exculpatory of Trusty because Trusty unlike Thornton was not involved in any pre-planning of the robbery.  In fact, when asked about Trusty, Davis stated that he (Trusty) had to know what was going on relative to the robbery, which is acknowledged by Trusty in his own statement.  Aside from this offhand comment regarding Trusty's knowledge of the robbery, Davis merely stated that Thornton and Davis were friends, a statement that can be excluded from the testimony regarding Davis's statement.

Based upon the foregoing, the Government believes that the statements of Davis and Trusty

can be sanitized in a way that will not offend *Bruton* and its progeny, and thus the defendants'
motion for severance should be denied.

## IV.   MISCELLANEOUS DISCOVERY MOTIONS

Lastly, the defendants raise a series of discovery motions that are largely moot.   The
Government has complied with its obligations under the applicable law and even continue to provide
information to the defense, outside these obligations, upon their request.

Out of an abundance of caution, the Government does, however, advise the defendants,
pursuant to Rule 404(b), that at least one Government witness will testify that the defendants knew
each other through their involvement in the Black Guerrilla Family (BGF).   While the Government
will make no further inquiry regarding the individual defendants involvement with BGF, the jury
needs to understand how the defendants and some of the cooperating witnesses, who otherwise do
not know each other, would agree to commit the charged crime.   The Government, therefore,
believes that the probative value of this limited inquiry outweighs any prejudice to the defendants
and will seek this limited admission during the case-in-chief.

## CONCLUSION

Based upon the foregoing, the Defendants' motions should be denied.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney


By:_____/s/_____
            James Wallner
            Assistant United States Attorney

24

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on this 22nd day of July, 2013, a copy of the foregoing Government's

Response in Opposition was electronically sent via CM/ECF and email to:

    Michael Montemarano,
    Archangelo Tuminelli, and
    Anton Keating

                            _____
                            James T. Wallner
                            Assistant United States Attorney

25